IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Swift Industries, Inc. d/b/a | : | CIVIL ACTION |
| Cardinal Saws & Blades | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 07-4631 |
| v. | : | |
| | : | Jury Trial Demanded |
| Husqvarna AB, | : | |
| Husqvarna Construction Products | : | |
| North America, and | : | |
| Soff-Cut International Inc. | : | |
| | : | |
| Defendants. | : | |

**THIRD AMENDED COMPLAINT**

Plaintiff Swift Industries, Inc. d/b/a Cardinal Saws & Blades by way of complaint against defendants Husqvarna AB, Husqvarna Construction Products and Soff-Cut International Inc., on knowledge and otherwise on information and belief, alleges as follows:

**JURISDICTION AND VENUE**

1.      This Court has federal question jurisdiction under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15(a) and 26; under the U.S. Patent laws, 35 U.S.C. §101 et seq.; under the Lanham Act, 15 U.S.C. §1125; and under 28 U.S.C. §§1331, 1337, 1338.  The Court also has diversity jurisdiction under 28 U.S.C. §1332 in that there is complete diversity between plaintiff and defendants.  The Court also has supplemental jurisdiction under 28 U.S.C. §1367(a) as to state law claims.

2.      Venue is proper in this Judicial District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because defendants resided, transacted business, were found, or had agents in this District, or because a substantial part of the events giving rise to plaintiff's

claims occurred in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

3.      This Court has personal jurisdiction over each defendant because, *inter alia,* each dfendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of saws and saw blades for cutting concrete throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in antitrust violations that were directed at plaintiff in this District, and that had a direct, foreseeable and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

4.      Plaintiff, Swift Industries, Inc. d/b/a Cardinal Saws & Blades ("plaintiff") is a Delaware corporation, having corporate headquarters at 100 Barren Hill Road, Conshohocken, Pennsylvania.

5.      Defendant Husqvarna AB ("Husqvarna AB") is a large international corporation headquartered in Sweden, with a place of business at Drottninggatan 2, Jonkoping (Husqvarna), Sweden.

6.      Defendant Husqvarna Construction Products North America ("Husqvarna Construction") is a subsidiary corporation of Husqvarna AB.  Husqvarna Construction has a place of business at 17400 West 119th Street, Olathe, Kansas 66061.

7.      Defendant Soff-Cut International Inc. ("Soff-Cut") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 1112 Olympic Drive, Corona, California 92881.  Husqvarna AB is Soff-Cut's parent company.

2

8.     Husqvarna AB, Husqvarna Construction and Soff-Cut will collectively be referred to as "defendants" in this Complaint.

## STATEMENT OF FACTS

### A. The Market for Cutting Green Concrete

9.     Concrete is a construction material that is made by mixing cement with sand, water, and an aggregate such as stone or gravel.  After concrete is poured, and in the first approximately 24 hours before it dries and cures, it is referred to in the building trade as "green" concrete.  It still contains a fair amount of water.

10.     On large construction projects that employ concrete contractors, such as paving highways, or pouring concrete floors for warehouses, office buildings, hotels, shopping malls, and so forth, concrete contractors cut contraction joints in green concrete.  These contraction joints permit the concrete to shrink as the water evaporates, preventing random cracking of the concrete as it cures, which can lead to spalling and deterioration.

11.     These contraction joints are usually cut to a depth of about one-quarter of the thickness of the concrete slab.   To illustrate, if the concrete slab is 8 inches thick, the contraction joint is cut to a depth of 2 inches.  These contraction joints would be cut about every 20 feet on the concrete slab in this example.

12.     When these contraction joints are not cut in green concrete, the concrete, when it dries, is prone to split and fracture at irregular points and in irregular ways, and random cracks can spall, leading to deterioration of the concrete.

13.      Concrete contractors use specialized machine saws with circular blades to cut green concrete.  Saws designed to cut "cured" or dry concrete, or to cut brick or other masonry, are not acceptable to cut green concrete, because they spoil the concrete.  The blades used to cut

3

green concrete are also unique and specialized.  Metal blade cores with synthetic diamond bearing segments on the periphery are used to cut green concrete.  A 14 inch circular blade for cutting green concrete is different from a 14 inch circular blade for cutting cured concrete.  For example, while saw blades to cut cured concrete are designed for "wet" sawing (where water is sprayed on the blade to reduce heat and friction), saw blades for green concrete are designed to be used dry.  The two blades are not substitutable.  The machine saws for cutting green concrete constitute a discrete relevant product submarket of the larger market of masonry saws used by concrete contractors.  Similarly, the replacement blades for those green concrete saws constitute a discrete relevant product submarket of the larger market for replacement masonry blades used by concrete contractors.

14.     Defendants, through their Soff-Cut subsidiary, market both saws to cut green concrete, and the diamond coated green concrete replacement saw blades.  Soff-Cut's United States' market share of both relevant product submarkets is more than 90%.   In June, 2007, Husqvarna AB purchased, and now owns, Soff-Cut.

15.     Since 2003, plaintiff has marketed diamond coated replacement blades for cutting green concrete that compete with Soff-Cut's blades.  Plaintiff's brand name is "Cardinal Uppercut."  Virtually all of plaintiff's business is in selling its green concrete saw replacement blades.  Plaintiff and a few other companies have less than 10% of this market, and defendants have the remainder.  Plaintiff and defendants are the only two competitors that make and distribute in the United States high quality diamond blades for cutting green concrete.

16.     Plaintiff's blades are superior in quality to defendants' blades, and cost substantially less.  To illustrate, below is a comparison of both companies' published 2007 list prices:

| BLADE DIAMETER (Thin Blades) | SOFF-CUT LIST | CARDINAL LIST |
|---|---|---|
| 5" | $109.99 | $65.00 |
| 5 ½" | $115.99 | $70.00 |
| 6" | $101.99 | $80.00 |
| 8" | $203.99 | $140.00 |
| 9" | $249.99 | $155.00 |
| 10" | $289.99 | $190.00 |
| 12" | $373.99 | $240.00 |
| 13 ½" | $438.99 | $280.00 |
| 14" | $449.99 | $295.00 |

| BLADE DIAMETER (Thick Blades for Wider Joints) | SOFF-CUT LIST | CARDINAL LIST |
|---|---|---|
| 5.16" | $203.00 | $159.00 |
| 6" | $190.99 | $169.00 |
| 8" | $328.99 | $223.00 |
| 10" | $463.99 | $315.00 |
| 10" | $665.99 | $452.00 |
| 12" | $586.99 | $398.00 |
| 12" | $825.99 | $561.00 |
| 12" | $1,065.99 | $724.00 |
| 13.5" | $655.99 | $445.00 |
| 13.5" | $917.99 | $624.00 |
| 14" | $685.99 | $450.00 |
| 14" | $926.99 | $630.00 |

17.    Defendants, through their Soff-Cut subsidiary, also market gasoline powered machine saws for cutting green concrete.  These saws are walk-behind machines that range in size, with the smallest having a 4.5 horsepower engine, and listing for about $2,300, and the largest having a 27 horse power engine and listing for more than $23,000.

18.    Plaintiff manufactures and distributes green concrete saw that contains the same Subaru 4.5 horsepower engine used by defendants, and competes with defendants' 4.5 horsepower saw.  Plaintiff's machine lists for $2,100.  Plaintiff has announced plans to

manufacture and sell larger green concrete saws that will compete with defendants' larger machines.

19.     Defendants control more than 90% of the submarket for green concrete saws, and more than 90% of the submarket for replacement green saw blades.

20.     The green concrete saws and saw blades are distributed in the following manner. Concrete contractors typically own their own saws.  Defendants and plaintiff sell their respective saws to independent building supply houses, which in turn sell the saws to concrete contractors. Some building supply houses retain ownership, and rent the saws to concrete contractors.

21.     Green concrete saw blades are sold by defendants and plaintiff to independent building supply houses, which in turn resell the blades to concrete contractors, the ultimate consumer.  Green concrete saw blades are consumables, insofar as they wear out with normal use and must be periodically replaced.

22.     Thus, a typical concrete contractor will typically have invested tens of thousands of dollars to purchase one or more of defendants' saws for cutting green concrete (or alternatively the building supply house will have invested these dollars to own the machines, which it rents to concrete contractors).  For a job that involves 100,000 square feet of concrete, a concrete contractor, to make contraction cuts in the green concrete, might purchase 10 or more replacement saw blades from the equipment supply house.

23.     The replacement blades for cutting green concrete are a significant source of Soft-Cut's revenue, upon which is able to make a very substantial profit margin.  To illustrate, it costs about the same amount to manufacture a blade that can cut "cured" concrete as opposed to a blade that can cut "green" concrete.  Defendants are able to sell their green concrete saw blades for a markup that is substantially more than the markup on a blade for cutting cured concrete.

24.     Defendants have been able to extract this profit margin, and keep competitors out of the submarket for marketing competing saw blades, by asserting that they have patent rights to a replacement saw blade having an irregularly-shaped, asymmetrical arbor hole.  (The hole in the saw blade is called an "arbor hole."  The blade mounts to what is called an "arbor" on the saw, a flanged mechanism which is fixed to the shaft of the motor).  Defendants claim rights to, among other things,  a concrete saw blade having an irregularly-shaped, assymetrical arbor hole, which is specially designed to mount to defendants' green-concrete saw having a matching, irregularly-shaped arbor.

25.     Plaintiff's competing blade successfully designs around this patent, and attaches to defendants' saws by means of a five-sided symmetrical arbor hole, and does not infringe any of defendants' patents.

### (B) Defendants' Anti-Competitive Conduct

26.     Defendants have engaged in anti-competitive conduct that is designed to eliminate plaintiff as a competitor, including the following.

### (1) Acquisition and Misuse of Control of Concrete and Masonry Saws and Blades

27.     Defendant Husqvarna AB has, over the past eight years, purchased and now owns many of the major companies that make saws and saw blades used in the construction industry, not just for cutting green concrete, but also for cutting cured concrete, brick, and other masonry. Those acquisitions include companies formerly known as Partner, Target, Felker, Truco, Cushion Cut, Dimas, MECO, Magnum, JKS Lamage, Diamant Boart and Soff-Cut.

28.     Many of these companies have existed for years, and have substantial reputations in the building trades industry.  The companies make a variety of kinds of saws and saw blades, including for example companies that make high-end saws for cutting cured concrete (e.g.

Target, Cushion Cut, MECO) and companies that make gas demolition and utility saws with circular blades used for demolition that can cut masonry, iron pipe, as well as concrete (e.g. Partner).

29.     Through these acquisitions, upon information and belief, Husqvarna AB owns and controls more than 50% of the market for industrial concrete and masonry saws and replacement saw blades and replacement machine parts in the United States.

30.     As Husqvarna AB states on its internet website, it is "Global No. 1" in "Diamond tools for construction and stone industries."  It states its "market position" as: "the world leader in diamond tools and cutting equipment for the construction and stone industries."   According to data it furnished to the SEC, its 2006 world sales were about $4.9 billion; its total U.S. sales were about $2.4 billion; and its Professional Products segment sales which includes cutting equipment had U.S. sales of about $900 million.

31.     These acquisitions have given defendants enormous power and leverage with the independent equipment supply houses that supply saws, replacement parts, and saw blades to contractors and builders, especially concrete contractors.  The supply houses will typically carry more than one brand of saws and blades for cutting concrete and masonry.  Most of these brands are now owned by defendants.

32.     Defendants have misused this power and control.  In an effort to put plaintiff out of business, defendants have:  (1) required independent supply houses to only carry Soff-Cut blades, and not plaintiff's competing blades;  (2) threatened independent equipment supply houses that they will lose **all** of the Husqvarna products they carry (i.e. a wide variety of saws, blades, and replacement parts listed in paragraph 27 above) if they carry Cardinal's green concrete replacement blades that compete with Soff-Cut's blades;  and/or (3) threatened

8

independent equipment supply houses that they cannot carry or service Soff-Cut machines or buy parts for those machines if they sell plaintiff's saw blades.

33.     In one instance, a customer sent its Soff-Cut saw to defendants for repair, prepaying the $1,400 repair charge.  When defendants discovered the customer had accidentally included one of plaintiff's replacement blades in the package (demonstrating that the customer had been using plaintiff's blades), defendants refused to repair the saw until the owner agreed to buy a significant number of Soff-Cut blades and promised not to use Cardinal blades ever again.

34.     Defendants have required independent supply houses that sell Soff-Cut blades not to carry plaintiff's competing blades, and many independent supply houses have agreed with Soff-Cut to do so.

35.     As a result of defendants' conduct, plaintiff has lost sales and potential sales of its products.

### (2) Misuse of Patents

36.     On October 19, 2007 and again on October 24, 2007, Husqvarna AB and Husqvarna Construction Products, respectively, sent plaintiff letters claiming that plaintiff was supposedly infringing **31 separate patents** for saw blades and machines for cutting green concrete.  Copies of these letters are attached as Ex. A hereto.  These letters made no effort to identify any particular claims in any of these patents that were supposedly infringed, nor to identify any manner in which plaintiff's products supposedly infringed these patents, nor to provide any specificity whatever.

37.     Neither of these letters was sent by a patent attorney.  One letter was sent by a Vice President of Construction Sales.  The other was sent by a Husqvarna AB Group Director who had only worked for Husqvarna for a short time.

38.    The letters asserting that plaintiff was infringing 31 patents are not objectively reasonable, and were sent with the subjective intent of driving plaintiff from the markets in which it competes with defendants.

39.    To illustrate, among the 31 patents claimed to be infringed are the following:

- **U.S. Patent No. 7,073,495,** entitled Method And Apparatus For Cleaning Concrete During Cutting.  This patent discloses and claims a concrete cutting machine having "one or more nozzles" connected to a "source of pressurized gas mounted on the saw".  Such a feature would be apparent on a machine.  Plaintiff has never, made, advertised, sold or offered for sale any saw that holds a source of pressurized gas.

- **U.S Patent No, 6,990,972, entitled Guide For Concrete Cutting Blade.** This patent discloses and claims the use of guide wheels both in front of, and behind the cutting blade.  Such a feature would be apparent on a machine.  Plaintiff has never, made, advertised, sold or offered for sale any saw that has guides in front and behind the blade.

- **U.S. Patent No. 5,689,072, entitled Method And Apparatus For Preloading A Skid Plate For An Early Cutting Concrete Saw.**  This patent discloses and claims the use of a skid plate that is preloaded, either by being bent or by use of a spring.  The use of these plates would be apparent on any concrete saw.  Plaintiff  has never, made, advertised, sold or offered for sale any skid plate. Furthermore, the skid plate repair kits sold by plaintiff contains no element that is preloaded.

- **U.S. Patent No. 5,664,553, entitled Spring Loaded Skid Plate For A Concrete Saw.**  This patent also discloses and claims the use of a skid plate that is preloaded, either by being bent or by use of a spring.  This would be apparent on a machine.  Plaintiff has never, made, advertised, sold or offered for sale any skid plate. Furthermore, the skid plate repair kits sold by plaintiff contain no element that is preloaded.

- **U.S. Patent No. 5,603,310, entitled Mounting Arbor For Saw Cutting Blades.** This patent discloses and claims a concrete saw with an arbor of a very specific irregular and asymmetrical shape.  The use of this shape would be apparent.  Plaintiff has never, made, advertised, sold or offered for sale any saw having the arbor shape being claimed.

- **U.S. Patent No. 5,303,688, entitled Mounting Arbor For Saw Cutting Blades.** This patent discloses and claims a concrete cutting blade with an arbor hole of a very specific irregular and asymmetrical shape.  This shape would be apparent.  Plaintiff has never, made, advertised, sold or offered

for sale any saw blade having the arbor shape being claimed.

- **U.S. Patent No. 5,570,677, entitled Method And Apparatus For Cutting Wet Concrete.**  This patent discloses and claims the use of a saw with a skid plate that is biased against the concrete by "at least one resilient member".  Such a skid plate would be apparent on the saw. Plaintiff has never, made, advertised, sold or offered for sale any saw having a skid plate. Furthermore, plaintiff has never used any such "resilient member".

- **U.S. Patent No. 4,903,680, entitled Skid Plate For Concrete Saw.**  This patent discloses and claims the use of a skid plate that has a wear resistant insert.  Plaintiff has never, made, advertised, sold or offered for sale any skid plate. Furthermore, the skid plate repair kits sold by plaintiff contain no wear resistant insert.

40.     On February 29, 2008, after plaintiff had expended substantial professional fees and costs to have these 31 patents analyzed, and after plaintiff had prepared, filed, and served a complaint in the present lawsuit seeking declaratory judgments for invalidity, and/or non-infringement, and/or unenforceability as to all of these patents,  defendants subsequently signed a covenant never to sue plaintiff as to 24 of these patents, in effect admitting that there was and is no basis for having asserted infringement for 77% of the patents listed in each of the two letters. A copy of this covenant is Ex. B hereto.

41.     Defendants still claim that plaintiffs have infringed the following seven (7) patents, by way of pending counterclaims in this litigation:

Patent No. 4,769,201

Patent No. 5,373,834

Patent No. 5,429,109

Patent No. 5,582,899

Patent No. 5,666,939

Patent No. 6,892,719

Patent No. 7,163,010

11

42.     Defendants' continued prosecution of these remaining 7 patents is being done without a reasonable objective basis, and for the anti-competitive purpose of harassing Plaintiff and seeking to drive plaintiff from the relevant replacement blade submarket, so that defendants can capture and control 100% of that submarket.

43.     Defendants procured one or more of the above patents through false and misleading statements to the U.S. Patent and Trademark Office.  The continued assertion of these patents against plaintiff constitutes anti-competitive conduct.

44.     Soff-Cut's U.S. Patent No. 7,163,010 ('010 Patent) is for a Skid Plate for Concrete Saw.  The '010 Patent was filed in the U.S. Patent and Trademark Office on August 31, 2004. It claims priority to U.S. Provisional Patent Application No. 60/576,467, filed on June 03, 2004.

45.     Edward Zuzelo is a shareholder of plaintiff.   Mr. Zuzelo invented one or more of the skid plate repair kit designs contained within the '010 Patent. Mr. Zuzelo patented his designs in U.S. Patent No. 7,007,686, filed on Feb 17, 2004.

46.     Edward Zuzelo displayed his skid plate repair kit design in a booth at a trade show in February 2004.  Soff-Cut's representative(s) visited the booth and observed the skid plate repair kit designs of Mr. Zuzelo.

47.     Soff-Cut's failure to cite the designs of Edward Zuzelo in the application for the '010 Patent constitutes inequitable conduct and fraud against the U.S. Patent and Trademark Office.

48.     On information and belief, Soff-Cut used Mr. Zuzelo's designs in its application for the '010 Patent without citing Mr. Zuzelo as the inventor.

12

49.     Defendants have also committed fraud with respect to Soff-Cut's U.S. Patent No. 6,892,719 ('719 Patent), another patent they have continued to assert against plaintiff.  That patent is for a Blade for Cutting Concrete.

50.     The application for the '719 Patent was filed on April 10, 2002.

51.     U.S. Patent No. 5,311,705 to Edward Zuzelo ('705 Zuzelo Patent), entitled Contoured Cutting Tool, shows a blade that is clearly relevant prior art to the '719 Patent and invalidates the '719 Patent.  Despite its high relevance, the '705 Zuzelo Patent was not disclosed to the U.S. Patent and Trademark Office by Soff-Cut during the prosecution of the application for the '719 Patent.

52.     From extensive discovery taken in a past litigation case Soff-Cut had been involved in with Edward Zuzelo, Soff-Cut had a copy of the '705 Zuzelo Patent.

53.     Soff-Cut, therefore, knew of the '705 Zuzelo Patent prior to the filing its application for the '719 Patent and failed to disclose the '705 Zuzelo Patent to the U.S. Patent and Trademark Office. This failure to cite material prior art violates the rules of the U.S. Patent and Trademark Office and constitutes both inequitable conduct and fraud.

54.     Further, defendants know that they have no good faith basis to claim that plaintiff has infringed many of these seven patents. To illustrate, defendants allege that plaintiff's infringe U.S. Patent No. 5,582,899 (the '899 patent).  As sole support in their Infringement Contentions, defendants' produced the Green Machine Manual.

55.     All of the allegedly-infringed claims of the '899 Patent recite "a piece of concrete".  Plaintiff does not make concrete, use, sell, offer for sale or import concrete.  Nor have defendants alleged that Plaintiff makes, uses, sells, offers for sale, or imports concrete.  Thus, Plaintiff does not literally infringe the '899 Patent.

56.     All of the allegedly-infringed claims of the '899 Patent further include the following limitation regarding the method of cutting a groove in the concrete: "cutting said groove in the surface with a rotating blade having an up-cut rotation and having a cutting edge and sides, the cutting occurring before the concrete has hardened sufficiently to allow cutting by a conventional abrasive concrete saw, while still producing an acceptable surface finish adjacent the cut groove, the cutting step occurring before the concrete has a hardness such that a 1.125 inch diameter steel rod having a flat end, and weighing about 5.75 pounds, would cause an indentation in the surface of the concrete of about 1/32 of an inch when the rod is dropped from a height of about 24 inches above the surface of the concrete."  The above-quoted method is referred to as the "Drop-Rod Test."

57.     The Green Machine Manual does not instruct, and on information and belief, defendants possess no other document of Plaintiff that instructs, the operator to use the Green Machine or any other saw before the concrete has a hardness such that a 1.125 inch diameter steel rod having a flat end, and weighing about 5.75 pounds, would cause an indentation in the surface of the concrete of about 1/32 of an inch when the rod is dropped from a height of about 24 inches above the surface of the concrete.

58.     The Green Machine Manual does not include or refer to the Drop-Rod Test.  On information and belief, defendants possess no other document or evidence of Plaintiff, which includes or refers to the Drop-Rod Test.  On information and belief, defendants possess no evidence that Plaintiff has ever instructed or encouraged a third party to practice the Drop-Rod Test.

59.     On information and belief, defendants possess no evidence that Plaintiff induces others to infringe the '899 Patent.  On information and belief, defendants possess no evidence

14

that any third party is directly infringing the '899 Patent.  Based solely on the Green Machine Manual, defendants' allegation of infringement of the '201 Patent was unreasonable and was made for the sole purpose of unfairly competing with and harassing plaintiff.

60.     Defendants allege that Plaintiff infringes U.S. Patent No. 5,666,939 (the '939 Patent).  All of the allegedly-infringed claims of the '939 Patent include the following limitation: "at least one support surface mounted on the saw so that the support surface contacts the concrete surface."  Defendants allege that the FlatTrac wheels of Plaintiff's Green Machine satisfy the quoted limitation.

61.     In a previous litigation, *Chiuminatta Concrete Concepts et al. v. Cardinal Industries, Inc., et al.* (the "Previous Litigation"), defendant Soff-Cut's predecessor asserted infringement of U.S. Patent No. 4,889,675, the parent of the '939 Patent, against an unrelated company, Cardinal Industries, Inc., for selling the same saw as Plaintiff's Green Machine.

62.     On appeal in the Previous Litigation, the Court of Appeals for the Federal Circuit ("CAFC") interpreted and opined that Cardinal Industries' FlatTrac wheels do not comprise "means connected to the saw for supporting the surface of the concrete adjacent the leading edge of the cutting blade", or a §112 equivalent thereof.  The language interpreted by the CAFC is identical in scope to the relevant limitation of the '939 Patent.  Therefore, under the precedent of the CAFC, the FlatTrac rollers of plaintiff's Green Machine do not comprise "at least one support surface mounted on the saw" recited in the claims of the '939 Patent.  Thus, based on CAFC precedent, defendants' allegation of infringement of the '939 Patent was unreasonable and was made for the sole purpose of unfairly competing with and harassing plaintiff.

### (3)    Foreclosing Plaintiff From Advertising In Trade Publications and At Industry Functions

63.    Defendants have misused their power to foreclose plaintiff from advertising in trade journals, in an effort to eliminate plaintiff from the marketplace.

64.    During 2005-2006, plaintiff had an ongoing business relationship with Cygnus Business Media ("Cygnus"), a publisher of trade magazines relating to saws and blades.  Plaintiff advertised in Cygnus' trade magazine named *Concrete Contractor*.

65.    Cygnus advised plaintiff that it would be important for plaintiff to advertise for multiple years in Cygnus' trade magazine in order to develop goodwill with customers and potential customers and, therefore, derive benefit from the advertising with Cygnus.

66.    Plaintiff had reasonable expectation that it would derive present and future economic benefits from advertising in Cygnus' trade magazines.

67.    Plaintiff spent a total of approximately $30,000 to advertise in Cygnus publications during late 2005 through early 2006.

68.    On information and belief, Soff-Cut knew of the relationship between plaintiff and Cygnus.

69.    On information and belief, Soff-Cut spent substantially more money annually advertising with Cygnus than plaintiff did.  Soff-Cut required Cygnus to discontinue accepting plaintiff's advertising.

70.    Upon learning of this, plaintiff's representative wrote to Cygnus in the fall of 2006, stating: "I am clear that you currently have an agreement with SoffCut which requires that you not accept any advertising from Cardinal in the Concrete Contractor publication."  Cygnus candidly responded:  "Our position will not change regarding *Concrete Contractor* as long as Soff-Cut is advertising with us. They are scheduled with us through the end of the year and are in

16

discussions with us for 2007.  I'm sorry.  My publisher made that very clear yesterday when we talked about this."

71.    Defendants further intentionally disrupted the relationship between plaintiff and Cygnus, with the express purpose to harm plaintiff, by engaging in wrongful conduct, which included making the false statement that there was current litigation between Soff-Cut and plaintiff.

72.    On information and belief, Soff-Cut also falsely and maliciously told Cygnus that Soff-Cut had a multi-million dollar judgment against plaintiff.

73.    On information and belief, Soff-Cut also threatened to pull its advertisements with Cygnus if Cygnus accepted plaintiff's advertising.

74.    Soff-Cut's conduct was undertaken wholly without privilege or justification.

75.    As a result of Soff-Cut's intentional acts, which, on information and belief, are continuing, the business relationship between plaintiff and Cygnus was and remains disrupted, in that Cygnus refused and continues to refuse to accept further advertising from plaintiff.

76.    Soff-Cut's interference with the business relationship between plaintiff and Cygnus has resulted in damage to Swift in terms of lost economic opportunity and harm to reputation in the marketplace.

77.    Soff-Cut's false statements to Cygnus derailed plaintiff's plans to advertise with Cygnus over a multi-year period and, therefore, caused Plaintiff to lose its approximately $30,000 investment and goodwill with customers and potential customers.

78.    Hanley Wood, LLC ("Hanley Wood") is a limited liability company, self-described on its website, www.hanleywood.com, as a "leading-edge business-to-business media and information company reaching audiences in residential housing and commercial

construction."  Like Cygnus, Hanley Wood produces trade magazines important in the market in which plaintiff and Soff-Cut compete.  Hanley Wood also operates the most important trade show in the industry, the World of Concrete trade show, usually held in January or February each year.

79.     On or about late 2005, Hanley Wood, through its agent and/or employee Mike Lesko, solicited plaintiff to sell it advertisement space in Hanley Wood's trade magazines in person, through U.S. mail, by telephone and through email on several occasions.

80.     On or about 2006, plaintiff attempted to purchase advertising space in Hanley Wood's trade magazines.

81.     On information and belief, Hanley Wood informed plaintiff that it would not accept advertising from plaintiff or only accept very limited advertising because Soff-Cut made a false statement to Hanley Wood that there was current litigation between Soff-Cut and plaintiff.

82.     Soff-Cut purchased a large amount of advertising at the 2007 World of Concrete show, including advertisements and sponsorships in various different forms.

83.     Due to the importance of the World of Concrete show, plaintiff also requested to purchase banner advertising at the 2007 World of Concrete trade show produced by Hanley Wood.

84.     Hanley Wood informed plaintiff, through its agent and/or employee Todd Gilmore, that it would not accept any banner advertising whatsoever from plaintiff for the World of Concrete show because of threats from Soff-Cut that it would pull out its considerable advertising at the show if Hanley Wood permitted plaintiff to advertise.

85.     Plaintiff had the valid and reasonable expectation that it would derive present and future economic benefits from advertising in Hanley Wood's trade magazines and at the World

18

of Concrete trade show produced by Hanley Wood. On information and belief, Soff-Cut knew of the relationships between plaintiff and Hanley Wood.  On information and belief, Soff-Cut intentionally disrupted these relationships, with the express purpose of harming plaintiff.  Soff-Cut's conduct was undertaken wholly without privilege or justification.

86.     As a result of Soff-Cut's intentional acts, which, on information and belief, are continuing, the business relationship between plaintiff and Hanley Wood was and remains disrupted, in that Hanley Wood has refused and continues to refuse to accept advertising from plaintiff or to accept only very limited advertising for Hanley Wood's trade magazines and trade shows.

87.     Soff-Cut's interference with the business relationship between plaintiff and Cygnus and plaintiff and Hanley Wood has resulted in damage to plaintiff in terms of lost economic opportunity and harm to reputation in the marketplace.

### (4) False Statements in the Industry

88.     Representatives of Soft-Cut have made false statements to buyers and potential buyers regarding the quality of plaintiff's products and the ability of plaintiff's products to work in conjunction with Soft-Cut's products, including for example, statements that use of a plaintiff replacement blade on a Soff-Cut saw will cause major and expensive damage to the saw's spindle shaft.

89.     Soff-Cut's false statements were made intentionally for the purpose of depriving plaintiff of sales and to damage plaintiff's reputation.

90.     As a result of Soff-Cut's false and disparaging statements, plaintiff has suffered lost sales, damage to reputation and other economic damages.

## COUNT I

### Declaratory Relief Of Patent Non-Infringement

91.     The foregoing allegations are repeated and realleged as if fully set forth herein.

92.     Defendants are currently accusing plaintiff of infringing the seven patents listed in paragraph 41 above.

93.     An actual controversy exists between plaintiff and defendants with respect to the noninfringement of these patents.

94.     Plaintiff's products do not and have not infringed these patents.

95.     Plaintiff, therefore, is entitled to declaratory relief stating that plaintiff's products do not and have not infringed these patents.

## COUNT II

### Declaratory Relief of Inequitable Conduct and Unenforceability

96.     The foregoing allegations are repeated and realleged as if fully set forth herein.

97.     Plaintiffs are currently aware, based upon investigation to date, that as to at least two of these seven patents, defendants have committed inequitable conduct in procuring these patents by failing to disclose relevant, material prior art of which defendants were aware.  See ¶¶ 43-53 above.

98.     Plaintiff seeks a declaration to this effect.

## COUNT III

### Declaration of Patent Invalidity

99.     The foregoing allegations are repeated and realleged as if fully set forth herein.

100.    One or more of the seven patents at issue are invalid for failing to satisfy the requirements of the U.S. Patent Laws, including 35 U.S.C. Sections 102, 103 and/or 112.

101.    Plaintiff seeks a declaration to this effect.

## COUNT IV

### Violation of Section Two of the Sherman Act, 15 U.S.C. §2

102.    The foregoing allegations are repeated and realleged as if fully set forth herein.

103.    The relevant product market consists of saws and saw blades used by contractors in the United States to cut concrete and masonry.   Upon information and belief, defendants have more than 50% of this market.

104.    A relevant product submarket consists of the saws used by concrete contractors in the United States to cut green concrete, and replacement parts for those machines.  Defendants have more than 90% of this market.  Because many concrete contractors own their Soff-Cut saws, at a cost of tens of thousands of dollars, there exists what is known as "installed based opportunism" as to this submarket.

105.    Another relevant product submarket consists of replacement saw blades used by concrete contractors in the United States to cut green concrete.  Defendants possess control of more than  90% of this market.

106.    Plaintiff competes with defendants in the two relevant product submarkets.

107.    Defendants have misused, are misusing, and have leveraged their market power in the larger relevant market to force plaintiff out of the two relevant sub-markets, and to acquire 100% control of both submarkets, by threatening dealers that **all** makes and models of **all** Husqvarna products will be discontinued unless dealers stop selling plaintiff's products.

108.    Defendants have also misused their power in the relevant submarket for green concrete saws to attempt to force plaintiff out of the relevant submarket for green concrete saw blades, in order to increase their share of the latter submarket to 100%, by requiring dealers to

sell only defendants' blades as a condition of continuing to selling Soff-Cut machines and replacement parts.

109.    Defendants have also misused their market power generally by forcing dealers to carry only defendants' green concrete saw blades, and prohibiting them from carrying plaintiff's competing blades, even though plaintiff's blades are of superior quality and cost less.

110.    Defendants have misused patents to attempt to drive plaintiff from the relevant submarkets.  They have threatened plaintiff with infringement of 31 patents when defendants had no objectively reasonable basis to do so, and with subjective anti-competitive intent.  Defendants have continued to assert in this litigation patents that defendants have obtained through material misstatements or omissions to the Patent Office, and patents they know are invalid.

111.    Defendants have misused their market power to deprive plaintiff of needed channels of industry advertising, both in media and at industry trade shows.

112.    Defendants have misused their market power by making false statements to customers and potential customers, in an effort to drive plaintiff out of the relevant submarkets.

113.    Plaintiff has been harmed and injured, and is threatened with future harm and injury, by defendants' actions.

## COUNT V

### Violation of Section One of the Sherman Act, 15 U.S.C. §1

114.    The foregoing allegations are repeated and realleged as if fully set forth herein.

115.    Defendants have forced independent supply houses to enter into illegal agreements not to carry plaintiff's products.

116.    Defendants have engaged in, and are engaging in, illegal tying arrangements, by requiring dealers to carry only Soff-Cut saw blades (and not plaintiff's competitive saw blades)

in order to carry the full line of Husqvarna products.  Defendants have market power in both the "tying" and "tied" market and submarket.

117.     Defendants have also engaged in, and are engaging in, illegal tying arrangements by requiring dealers to carry only Soff-Cut saw blades (and not plaintiff's competitive saw blades) in order to carry Soff-Cut machines and replacement parts for those machines. Defendants have market power in both the "tying" and "tied" submarkets.

118.      Plaintiff has been harmed and injured, and is faced with future harm and injury, by defendants' actions.

### COUNT VI

### Unfair Competition and False Advertising under the Lanham Act

119.     The foregoing allegations are repeated and realleged as if fully set forth herein.

120.     The defendants' actions described herein constitute unfair competition and false advertising under the Lanham Act.

121.     The defendants' actions were done with the intent, purpose and effect of procuring an unfair competitive advantage over plaintiff.

122.     The defendants will continue to unlawfully procure business that they would not otherwise obtain fairly on the open market.

123.     Plaintiff has sustained irreparable harm to its business, reputation, and goodwill, and, unless the defendants are enjoined and restrained by this Court, defendants will continue in the activities alleged herein and as a result thereof, plaintiff will continue to sustain irreparable harm to its business, reputation and goodwill.

124.     Plaintiff has no adequate remedy at law.

125.    Defendants' acts have been willful and/or with a wanton and reckless disregard for plaintiff's rights.

## COUNT VII

### Common Law Unfair Competition

126.    The foregoing allegations are repeated and realleged as if fully set forth herein.

127.    The Defendants' actions described herein constitute common law unfair competition.

128.    The Defendants' actions were done with the intent, purpose and effect of procuring an unfair competitive advantage over plaintiff.

129.    The Defendants will continue to unlawfully procure business that they would not otherwise obtain fairly on the open market.

130.    Plaintiff has sustained irreparable harm to its business, reputation, and goodwill, and, unless the Defendants are enjoined and restrained by this Court, defendants will continue in the activities alleged herein and as a result thereof, plaintiff will continue to sustain irreparable harm to its business, reputation and goodwill.

131.    Plaintiff has no adequate remedy at law.

132.    Defendants' acts have been willful and/or with a wanton and reckless disregard for plaintiff's rights.

## COUNT VIII

### Tortious Interference with Actual and Prospective Business Relationship

133.    The foregoing allegations are repeated and realleged as if fully set forth herein.

134.    Defendants' actions described herein constitute tortious interference with actual and prospective business relationship.

135.     Defendants acted maliciously and wantonly in interfering with plaintiff's business relationships with Cygnus Business Media and Hanley Wood.

136.     Plaintiff has sustained financial harm to its business as a result of Defendants' actions.

## COUNT IX

### Commercial Disparagement

137.     The foregoing allegations are repeated and realleged as if fully set forth herein.

138.     Defendants made false statements of fact or stated incorrect statements of opinion about plaintiff and plaintiff's products as described herein knowing that the false or incorrect statements would cause pecuniary loss to plaintiff.

139.     Defendants acted maliciously and wantonly in commercially disparaging plaintiff.

140.     Plaintiff has sustained financial harm to its business as a result of Defendants' actions, including, without limitation, a loss of approximately $30,000 that plaintiff paid to Cygnus to start what was to be a multi-year advertising program.

## COUNT X

### Defamation

141.     The foregoing allegations are repeated and realleged as if fully set forth herein.

142.     Defendants intentionally made false statements of fact or stated incorrect statements of opinion about plaintiff and plaintiff's products as described herein knowing that the false or incorrect statements would cause damage to plaintiff's reputation.

143.     Defendants acted maliciously and wantonly to defame plaintiff.

144.     Plaintiff has sustained harm to its reputation and the reputation of its products as a result of Defendants' actions.

## COUNT XI

## Unjust Enrichment

145.    The foregoing allegations are repeated and realleged as if fully set forth herein.

146.    Defendants have obtained benefits to the detriment of plaintiff through Defendants' unlawful actions described herein, thus violating principals of justice, equity and good conscience.

147.    Defendants have been unjustly enriched by these actions to the detriment of plaintiff.

WHEREFORE, Plaintiff prays for the following relief:

a)  A declaration that the seven patents which defendants claim plaintiff has infringed are either not infringed, and/or are invalid and/or are unenforceable because of inequitable conduct before the PTO;

b) Entry of a preliminary and permanent injunction enjoining defendants, their officers, agents, servants, employees, and attorneys from threatening any supplier, customer, or dealer of plaintiff's not to carry plaintiff's products, advertising, or participation at trade shows, and enjoining defendants from threatening any person that defendants' business will be removed or discontinued if that person also carries plaintiff's products;

c) Compensatory damages for all injuries plaintiff has suffered, treble or enhanced damages as provided by law, and punitive damages on state law claims, together with prejudgment interest accrued thereon;

d) Award costs, disbursements and interest.

e) Award attorneys fees.

f)  Grant such other and further relief as the Court may deem just and proper.

Dated:  May 30, 2008

FRANK A. MAZZEO, P.C.


By:  /Frank A. Mazzeo/
     Frank A. Mazzeo, Esquire
     PA I.D. #65537

808 Bethlehem Pike
Suite 200
Colmar, PA 18915
frank@mazzeolaw.com
215-997-0248 (t)

KOHN, SWIFT & GRAF, P.C.
By: Joseph C. Kohn,
Robert LaRocca
Craig Hillwig
Kohn, Swift & Graf, P.C.
Suite 2100
One South Broad St.
Philadelphia, PA 19107
rlarocca@kohnswift.com
chillwig@kohnswift.com
215-238-1700

Joseph M. Konieczny, Sr.
Meetinghouse Business Center
2260 Butler Pike, Suite 100
Plymouth Meeting, PA 19462
jkonieczny@jmkpc.com
610-940-1962

Attorneys for Plaintiff
Swift Industries, Inc. d/b/a
Cardinal Saws & Blades

# EXHIBIT A

# ⒽHusqvarna

Cardinal Saws & Blades
100 Barren Hill Road
Conshohocken, PA 19428
USA



RECEIVED
OCT 22 2007
BY: ------------------

| Date | Our reference |
|---|---|
| October 19, 2007 | L1106US00 |

Dear Sirs,

I write in my capacity as Director of Intellectual Property for Soff-Cut International Inc., 1112 Olympic Drive, CA 92881 Corona, United States, and its parent company Husqvarna AB (together referred to in this letter as "Husqvarna").

It has come to Husqvarna's attention that your company is making, using, selling, and/or offering for sale certain products, including but not limited to saw blades and skid plates, associated with the cutting of green concrete and which may infringe, contribute to infringement, or induce infringement of one or more of Husqvarna's United States Patent Nos.: 4,769,201, 4,889,675, 4,903,680, 4,928,662, 4,938,201, 5,056,499, 5,086,750, 5,184,597, 5,303,688, 5,305,729, 5,373,834, 5,429,109, 5,441,033, 5,505,189, 5,507,273, 5,570,677, 5,575,271, 5,579,753, 5,579,754, 5,582,899, 5,603,310, 5,660,161, 5,664,553, 5,666,939, 5,689,072, 5,803,071, 6,892,719, 6,990,972, 7,073,495, 7,163,010 and 7258115. Furthermore, additional patents are pending on this technology. Please be advised that Husqvarna does not extend licenses to practice these patents other than to purchasers of their products and then only subject to the extent specifically stated in the product sale.

Husqvarna vigorously enforces its intellectual property rights and will take any and all actions necessary to enforce its rights associated with the above mentioned patents. To that end, we hereby demand that you immediately cease all manufacture, use, sales and/or offers for sale of any saw blades, skid plates or other related products that infringe the Husqvarna patents noticed above either directly, contributorily or by inducement.

In this connection, please be informed that Husqvarna will seek all appropriate remedies to which it may be entitled under applicable law. United States federal patent laws prohibit the manufacture, use, sale and/or offer for sale of patented inventions in the United States, including direct, contributory, and induced infringement. In addition to injunctive relief, the federal patent laws provide for recovery of actual damages (which may be trebled), costs and attorneys fees.

| Postal address | Office address | Telephone exchange | Fax | Reg. No. | Vat No. | Reg. office |
|---|---|---|---|---|---|---|
| Husqvarna AB (publ) SE-561 82 Huskvarna Sweden | Drottninggatan 2 | +46 36 146500 | +46 6 147030 | 556000-5331 | SE556000533101 | Jönköping Sweden |

# ⊕ Husqvarna

Please also appreciate that this letter is not intended to be a complete statement of Husqvarna's rights and shall not be construed as waiver of any legal or equitable rights or remedies of Husqvarna, all of which are expressly reserved.

We request that any communication in this matter be directed to the undersigned rather than Soff-Cut International Inc. directly. Should you have any questions or concerns, please feel free to contact the undersigned at your earliest convenience.

Yours sincerely,
HUSQVARNA AB

Mats Udén
Group Director of Intellectual Property

| Postal address | Office address | Telephone exchange | Fax | Reg. No. | Vat No. | Reg. office |
|---|---|---|---|---|---|---|
| Husqvarna AB (publ)<br>SE-561 82 Huskvarna<br>Sweden | Drottninggatan 2 | +46 36 146500 | +46 6 147030 | 556000-5331 | SE556000533101 | Jönköping<br>Sweden |



**⊕Husqvarna**

October 24, 2007

Cardinal
100 Barren Hill Rd.
ConshohockenPA19428

To Whom It May Concern,

As you may be aware of Soff-Cut International Inc. became a subsidiary of Husqvarna AB group if companies on 5 June 2007 and which are collectively referred to herein as "Husqvarna".

It has come to Husqvarna's attention that your company is making, using, selling, and/or offering for sale certain products, including but not limited to saw blades and skid plates, associated with the cutting of green concrete and which may infringe, contribute to infringement, or induce infringement of one or more of Husqvarna's United States Patent Nos.: 4,769,201, 4,889,675, 4,903,680, 4,928,662, 4,938,201, 5,056,499, 5,086,750, 5,184,597, 5,303,688, 5,305,729, 5,373,834, 5,429,109, 5,441,033, 5,505,189, 5,507,273, 5,570,677, 5,575,271, 5,579,753, 5,579,754, 5,582,899, 5,603,310, 5,660,161, 5,664,553, 5,666,939, 5,689,072, 5,803,071, 6,892,719, 6,990,972, 7,073,495, 7,163,010 and 7258115. Furthermore, additional patents are pending on this technology. Please be advised that Husqvarna does not extend licenses to practice these patents other than to purchasers of their products and then only subject to the extent specifically stated in the product sale.

Husqvarna vigorously enforces its intellectual property rights and will take any and all actions necessary to enforce its rights associated with the above mentioned patents. To that end, we hereby demand that you immediately cease all manufacture, use, sales and/or offers for sale of any saw blades, skid plates or other related products that infringe the Husqvarna patents noticed above either directly, contributorily or by inducement.

In this connection, please be informed that Husqvarna will seek all appropriate remedies to which it may be entitled under applicable law. United States federal patent laws prohibit the manufacture, use, sale and/or offer for sale of patented inventions in the United States, including direct, contributory, and induced infringement. In addition to injunctive relief, the federal patent laws provide for recovery of actual damages (which may be trebled), costs and attorneys' fees.

Please also appreciate that this letter is not intended to be a complete statement of Husqvarna's rights and shall not be construed as waiver of any legal or equitable rights or remedies of Husqvarna, all of which are expressly reserved.

Should you have any questions or concerns, please feel free to contact Mats Udén, Director of Intellectual Property, Husqvarna AB at your earliest convenience (e-mail mats.uden@husqvarna.se or tel +46 36 36 40 44).

Yours sincerely,

Steve Chamberlin
Vice President of Construction Sales

# EXHIBIT B

## COVENANT NOT TO SUE

Soff-Cut International Inc. ("Soff-Cut"), on behalf of itself and any successors-in-interest

to U.S. Patent Nos.:

| | | |
|---|---|---|
| 4,889,675 | 5,305,729 | 5,603,310 |
| 4,903,680 | 5,441,033 | 5,660,161 |
| 4,928,662 | 5,505,189 | 5,664,553 |
| 4,938,201 | 5,507,273 | 5,689,072 |
| 5,056,499 | 5,570,677 | 5,803,071 |
| 5,086,750 | 5,575,271 | 6,990,972 |
| 5,184,597 | 5,579,753 | 7,073,495 |
| 5,303,688 | 5,579,754 | 7,258,115 |

hereby (i) warrants and represents that it is the sole and exclusive assignee of the above listed

U.S. Patents and (ii) unconditionally and irrevocably covenants not to assert a claim for patent

infringement (including direct infringement, contributory infringement, or inducing

infringement) against Swift Industries, Inc. d/b/a Cardinal Saws & Blades ("Swift") under any

claim of the above-listed patents (and only these patents and not any claims in any other patent),

provided, however, that this covenant extends only to any method, process, or product made,

used, offered for sale, sold, or imported by Swift, whether in the past, the present or the future,

which method, process or product was commercially available for use or sale prior to or as of the

date of this covenant, as set forth below.  This covenant does not extend to any predecessor-in-

interest, successor-in-interest, affiliate or customer of Swift, nor does it extend to any method,

process or product that is not commercially available for sale prior to or as of the date of this

covenant, as set forth below.

In granting this covenant, Soff-Cut in no way waives or concedes any right it may have to enforce prior consent judgment(s) against any predecessor-in-interest and/or related entity to Swift. Further, Soff-Cut in no way concedes Swift's allegations that the claims of the above-stated patents are not infringed.

**SOFF-CUT INTERNATIONAL INC.**

By: _Samuel J. Muscarella_
Title: _CORPORATE SECRETARY_
Date: _2/29/2008_

-2-